Jones, Chief Judge,
joins in the dissent.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs are corporations organized and existing under the laws of the State of South Carolina and were at all pertinent times engaged as general construction contractors.
2. This case arises out of a contract, dated May 31, 1957, entered into by plaintiffs as joint venturers with the Department of the Navy, Bureau of Yards and Docks, for the construction of four 3-story 252-enlisted men’s barracks of identical design and contiguous location, and one 1-story 86-cn listed men’s barracks, at the United States Marine Corps Auxiliary Air Station, Beaufort, South Carolina, for a total contract price of $1,120,402. By agreement between plaintiffs, the active performance of the contract was to be by *374 Crosland-Roof Construction Company, whose principal office was and is located in Columbia, South Carolina.
3. Plaintiffs contend that defendant breached the contract and caused plaintiffs damage by issuance of a stop order which plaintiffs assert unreasonably delayed all productive work for a period of approximately 18 days. Defendant asserts, on the other hand, that neither by its express terms nor by its actual application did the stop order result in a cessation of, or delay to, the project as a whole, and that there was no curtailment of any portion of the work of such magnitude or significance as to constitute a compensable breach of the contract.
4. The contract reads in pertinent parts as follows:
8. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: Provided, iiowevm\ That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
* * Sfc # *
34. CHANGES BOARD AND ESTIMATES
In determining any equitable adjustment under clause 3, the Contracting Officer shall, in those instances where the adjustment to be made in compensation is estimated by the Contracting Officer to amount to $10,000 or more, convene, and give full consideration to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contract *375 ing Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time, or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 percent shall be added by said board to adjust the Contractor’s profits. In arriving at the amount of the change in price, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items.
* * ❖ * *
48. TERMINATION EOR CONVENIENCE OP THE GOVERNMENT
(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
(b) After receipt of a Notice of Termination, and except as otherwise directed by the Contracting Officer, the Contractor shall (1) stop work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services, or facilities except as may be necessary for completion of such portion of the work under the contract as is not terminated; * * *.
(c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form and with certification prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than two years from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer upon request of the Contractor made in writing within such two-year period or authorized extension thereof. However, if the Contracting Officer determines that the facts justify such action, he may receive and act upon any such termination claim at any time after such two year period or extension thereof. *376 Upon failure of the Contractor to submit its termination claim within the time allowed, the Contracting Officer may determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination and thereupon shall pay to the Contractor the amount so determined.
*****
57. disputes
Clause 6 is deleted, and the following clause is substituted therefor:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Chief of the Bureau of Yards and Docks, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Chief of the Bureau of Yards and Docks a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive; provided that, if no such appeal is taken, the decision of the Chief of the Bureau of Yards and Docks shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the decision of the Chief of the Bureau of Yards and Docks. The term “Chief of the Bureau of Yards and Docks” as used herein shall include his duly appointed successor or his representative specially designated for this purpose. If any of the moneys used to pay for work under this contract were appropriated by Public Law 488, 82nd Congress, or by Public Law 179, 83rd Congress, the Contractor, notwithstanding the foregoing provisions, shall have such right of appeal to the Court of Claims as is provided respectively by sections 635 or 632 of those laws.
The contract provided that the work was to be started on June 5, 1957, and to be completed on May 31, 1958. *377 Assessment of liquidated damages in the amount of $400 per calendar day against plaintiffs was provided for failure to complete the work within the specified time, but plaintiffs were not to be charged with damages and were to be entitled to an extension of time to complete the work in case of delay not caused by plaintiffs’ fault or negligence.
5. The contract specifications provided that the barracks were to be reinforced concrete frame structures. The four 3-story 252-men’s barracks were to be supported on pile foundations and the one 1-story 86-men’s barracks was to be supported on spread footings. The ground floors of all of the 252-men’s barracks were to be reinforced concrete slabs on grade and the remaining floors were to be self-supporting reinforced concrete slabs. Substantially all of the walls and partitions were to be concrete masonry. The roofing was to be built-up on rigid insulation over concrete deck. All of the buildings were to be with plumbing, electrical, and heating systems, complete and ready for use.
6. In addition to their overall responsibility for the performance of the contract, plaintiffs’ principal work on the job was the pouring and finishing of the concrete, including the setting and removal of the forms. Plaintiffs entered into subcontracts covering a substantial portion of the aggregate contract. Included in the subcontracts was the electrical work, the laying of concrete masonry blocks, the placing of reinforcing steel, and the plumbing and heating. Plaintiffs have asserted no claim on behalf of any of their subcontractors, nor have any of the subcontractors made claim against plaintiffs for damages for delay.
7. Plaintiffs were at all pertinent times also engaged under another contract in constructing for a total contract price of approximately $175,000 a combat training pool and bathhouse located on the same air station on which the barracks, involved in the instant suit, were located. Plaintiffs’ work crews and supervisory personnel were interchanged between the barracks and the combat training pool. Plaintiff’s subcontractors on the barracks for reinforcing steel and for plumbing were also subcontractors for similar work on the combat training pool.
8. Based upon a then foreseeable surplus of barracks *378 spaces, a limited expenditure ceiling, and contract savings estimated by defendant of $150,000 to $190,000, defendant decided in the latter part of December 1957 to issue a stop order to plaintiffs on any work on the third floor of the barracks and to obtain from plaintiffs cost estimates on three alternate plans of deletion. The essence of this decision and the details of the alternate plans of deletion were communicated by defendant to plaintiffs by telephone on December 23, 1957, and on that date plaintiffs sent to certain of their subcontractors letters which read as follows:
The Eesident Officer in Charge of Construction on the above mentioned project 'has requested that we submit, at the earliest possible time, a cost estimate on making each of the following plans of deletion:
(1) To eliminate the third floor from each of the four 252 man barracks.
(2) To eliminate the third floors from buildings #P81-11 and #P81-10 and to eliminate the second and third floors of building #P81-9.
(3) To eliminate all of building #P81-9 from the top of the First floor slab up.
Please prepare your cost estimates for the materials and labor to Be deleted in your part of the work, broken down into items with labor and materials separate. Forward this to us in six (6) copies.
Your cooperation in working up this estimate at the earliest possible time will be appreciated.
9. On December 24, 1957, plaintiffs received the following telegram from defendant:
WESTERN UNION TELEGRAM AA375
A CNA407 GOVT DL PD — YD CHARLESTON SOCAR 24 324P ME — ROBERT E LEE AND CO INC—
DEC 24 PM 3 41
CROSLAND-ROOF CONSTR CO PO BOX 1313 COLUMBIA SOCAR—
241655Z NBY-5686 REQ ALL WORK ON THIRD FLOOR BARRACKS BE STOPPED REQ SUBMIT DEDUCTIVE COST THREE WAYS (A) DELETE THIRD FLOOR ALL BARRACKS (B) DELETE THIRD FLOOR ON TWO BARRACKS AND TWO *379 FLOORS ON LAST BARRACKS (C) DELETE ONE ENTIRE BARRACKS DRAWING TO FOLLOW FOR (A) REQUEST BOARD MEETING AS SOON AS POSSIBLE-
RESIDENT OFFICER IN CHARGE OF CONSTRUCTION MARINE CORPS AUXILIARY AIR STATION BEAUFORT SOCAR—
10. Under date of December 26,1957, defendant forwarded to plaintiffs drawings which depicted the method which was to be used in event proposal (A) should be adopted for the conversion of the third floor slab of each of the four 252-enlisted men’s barracks into a built-up roof. In an accompanying letter, defendant advised plaintiffs as follows:
* * * It is requested that the same drawings be utilized for part B of the message. It is further requested that the contractor include in his cost for part C the cost of demolishing the completed work to the footing level only and covering existing footings with a layer of earth approximately a foot deep.
Proposal (B) entailed the completion of one of the foregoing barracks, in accordance with the original plans and specifications, the deletion of the third floors of two of said barracks, and the elimination of the second and third floors of one of said barracks. The drawings had no applicability to proposal (C) which entailed the deletion of one of said barracks.
11. A letter dated January 1, 1958, from plaintiffs to defendant reads in part as follows:
This will acknowledge receipt of your telegram of December 24, 1957, requesting that all third floor work on the above project be stopped pending a decision on some contemplated changes.
As directed, this part of the work has been suspended, and we are preparing the estimated cost for the proposed changes as outlined in your telegram. Just as soon as these costs can be determined, you will be advised so that a board meeting can be arranged.
12. The body of a letter dated January 6,1958, from plaintiffs to defendant reads as follows:
In compliance with your telegram of December 24, 1957 we have curtailed work on the above mentioned *380 project and prepared cost estimates on the three plans of deduction which you suggested.
These cost estimates were prepared without accurate drawings or specifications covering same and were prepared following the best judgment of ourselves and our Sub-contractors. In the event one of these estimates is accepted we would request that a conference be held so that the concept of the changes by which we and our Sub-contractors worked up these changes would be followed.
We would like to call your attention also to the fact that practically all of the material used in these buildings is of special make or order and most of it has been delivered or already fabricated.
We submit for your consideration the following estimates of which breakdowns in four (4) copies are herewith enclosed:
Deletion Plan “A”
To delete the third floors from all four buildings Deduct $61,239.36 Deletion Plan “B”
To delete the third floors from buildings #P81-11 and #P81-10 and the second and third floors from building #P81-9
Deduct $65,172.68 Deletion Plan “C”
To delete all of building #P81-9 from the pile caps up.
Deduct $60,880.28
The restrictions under which the work is now being carried on are costing us in increased overhead, supervision, and equipment costs the added sum of $144.85 per day. Your early decision as to acceptance or rejection of these cost estimates would be beneficial to all concerned.
13. Because the contract savings which had previously been estimated by defendant would not be realized under any of the three cost estimates submitted by plaintiffs and also apparently because of a revision in defendant’s anticipated need of 'barracks spaces, defendant decided to direct plaintiffs to proceed with the contract according to the original plans and specifications. The body of a letter dated January 10, 1958, from defendant’s resident officer in charge of construction to plaintiffs reads as follows:
*381 Confirming our telephone conversation this date, you are hereby directed to proceed with the subject contract according to the original plans and specifications. The stop order issued 24 December 1957 for the third floor of the subject barracks is hereby removed.
Your cooperation in quickly submitting your cost estimates for deletion of the third floors of the barracks under the subject contract is greatly appreciated by this office.
14. When the stop order was issued on December 24,1957, the 1-story 86-enlisted men’s barracks was from 50 percent to 60 percent complete. Plaintiffs’ work crews were awaiting the completion of certain subcontractor work before resuming plaintiffs’ work and hence there was no work done on this barracks during the stop order period by plaintiffs’ work crews. The stop order did not result in the suspension of any work underway on this barracks.
15. The four 252-enlisted men’s barracks were in different stages of construction when the stop order was issued. No concrete blocks had yet been laid for the exterior walls on any of these barracks.
(a) On barracks P-81-12 all of the concrete had been poured to and including the slab for the third floor; a number of concrete columns extending from the third floor to the roof had been poured and forms were being constructed for other columns; the two end walls, extending from the third floor slab to the roof, were poured, and forms were in place in preparation for pouring one section of the roof slab, which, like the various floor slabs, was formed and poured in sections. Much of the form work had not yet been removed from the concrete which had been poured on and above the level of the third floor slab, and some form work and bracing was still in place below the third floor slab.
(b) On barracks P-81-11 the concrete work was generally completed, up through the columns extending to, and eventually supporting, the third floor slab, although the center section walls (interior) and stairwell on the second floor level had not yet been formed or poured. Form work was in place for the pouring of concrete of one section of the third floor slab. Much of the form work had not yet been removed from concrete which had already been poured.
*382 (c) On barracks P-81-10 the first floor slab and several columns resting upon it were in place. There was no construction above the first floor other than the columns.
(d) Barracks P-81-9 had some grade beams and footings poured but the first floor slab had not yet been poured.
16. Although there is conflict in the testimony respecting the Christmas vacation by plaintiffs* work crews, the weight of the creditable evidence is that prior to the receipt of the stop order, plaintiffs had decided to “take off” from the job-site the week beginning Monday, December 23, 1957, as a Christmas vacation, and to return to work on Monday, December 30, 1957; and that at the time the stop order was received by plaintiffs (Tuesday, December 24, 1957), none of plaintiffs’ work crews was on the jobsite. The only work which was done on the barracks during the Christmas vacation (Monday, December 23, to Monday, December 30,1957) was by plaintiffs’ masonry and plumbing subcontractors who performed some work on the 86-enlisted men’s barracks on Friday and Saturday, December 27 and 28, 1957. The only work which was done on the combat training pool during this Christmas vacation was by plaintiffs'’ electrical subcontractor on December 26,27, and 28,1957.
17. On Monday, December 30,1957, plaintiffs’ work crews, as well as the work crews of plaintiffs’ principal subcontractors, returned to the jobsite in substantially the same numbers and types (carpenters, concrete masons, laborers, etc.) as before the Christmas vacation, and except as hereafter specifically noted, were so maintained for full working days until after the stop order was removed on Friday, January 10, 1958.
18. At the trial testimony was elicited on behalf of plaintiffs to the effect that after receiving the stop order plaintiffs continued their work crews on the job in order not to lose them to other projects in the area; that their principal work while the stop order was in effect consisted of cleaning and stacking forms, removing debris, and similar cleanup work, some of which had to be i’edone at the completion of the job; that their schedules were upset; that they lost “momentum” in the progress of the job, and that not more than 10 percent of their work was productive in the sense that it contributed *383 toward tlie completion of tbe barracks. The weight of the evidence, including the inspector’s daily reports and time sheets, is, however, that productive work was accomplished by plaintiffs’ work crews, with the knowledge and consent of defendant, on the dates indicated as follows:
(a) Monday, December 30, 1957:
Forming 3rd Floor North end on P-81-11 — & Center Section entrance & Stairways, Columns on P-81-10 to 2sn Floor. Removing Forms From 2sn & 3rd Floor. Poured Section on P-81-12 — Finishing Poured Concrete. Completed Excavation & Cut Off of Piles on P-81-9.
The crane operator worked only 4 hours.
(b) Tuesday, December 31, 1957:
Formed 3rd Floor North end on P-81-11 Forming Center Section to 2sn Floor Walls & Stairway P-81-11. Forming Column to 2sn Floor on P-81-10. Removing Forms From 2sn Floor Poured Concrete on P-81-12. Finishing & Pointing Up Poured Cone. Completed All Pile Cap. Footing. (Poured out on P-81-9.
The crane operator did not work at the barracks.
(c) Wednesday, January 1, 1958:
Formed & Poured 3rd Floor North end Section on P-81-11. Forming Center Section & Stairways. Walls— Formed Column to 2sn Floor on P-81-10. Removing False Work & decking Forms From 2'sn Floor on P-81-12. Rubbing & Finishing Poured Concrete.
(d) Thursday, January 2, 1958:
Forming Center Section to 2sn Floor on P-81-11. Forming North & South end & 2sn Floors on P-81-10. Removing Forms From 2sn & 3rd Floor on P-81-12 Rubbing & Pointing Up Poured Concrete Cleaning & Rebuilding Forms.
(e) Friday, January 3, 1958:
Forming Center Section to 2sn Floor on P-81-11. Forming North & South end Walls & 2sn Floor on P-81-10. Removing Forms From P-81-12. Rubbing & Pointing Up Poured Concrete.
On this date about half of plaintiffs’ work crews on the barracks shifted to the combat training pool where they *384 engaged for the day in productive work. (Plaintiffs’ work crews did not work on Saturdays or Sundays.)
(f) Monday, January 6, 1958:
Forming Center Section to 2sn Floor & Equipt Room to Roof Slab on P-81-11. Forming South end to 3rd Floor on P-81-11. Removing Forms From 2sn & 3rd Floors on Poured Concrete — Finishing Concrete After Forms Removed.
The specifications provided that no concrete should be poured unless the temperature was at a minimum of 40° F. and rising. On this date the weather precluded the pouring of concrete.
(g) Tuesday, January 7, 1958:
No Work by Prime Contractors or Sub This Date Due to Rain & Cold Weather.
Plaintiffs’ work force consisted of only four supervisors on this day.
(h) Wednesday, January 8, 1958:
No Work by Prime Contractor or Sub This date. Due to Cold Weather. 30°
Except for the supervisors and a concrete niason, plaintiffs’ work force was engaged only 2 hours.
(i) Thursday, January 9, 1958:
No Work by Prime Contractor or Sub This Date. Due to Cold Weather 20°
Plaintiffs’ work force consisted of only four supervisors on this day.
(j) Friday, January 10, 1958:
Unloading a Part Car of Glazed Tile & Stored on Job. No Other Work by Prime Contractor due to 20° Cold Weather. (Crane Opr. Cleaning & Greasing, Washing down Machine
19. Plaintiffs’ subcontractors had work crews on the job on each of the days during which plaintiffs’ work crews were engaged.
20. (a) The evidence establishes that the stop order of December 24, 1957, was not intended by defendant nor interpreted by plaintiffs as an order to stop all productive work. *385 As appears in finding 15, supra,, at the time of the issuance of the stop order there was only one barracks, P-81-12, which had structural work above the third floor. During the stop order period, as appears in finding 18, supra, plaintiffs did productive work on this barracks, even on the third floor slab. This work included the rubbing and pointing up of concrete, in addition to removing and rebuilding of forms. If the stop order had not been issued, plaintiffs probably would have poured one of the four sections of the roof slab on barracks P-81-12 during the stop order period, but the evidence does not establish that the delay in the pouring of this roof slab unduly delayed or interfered with the other work on this barracks.
(b) In addition to other productive work which plaintiffs did during the stop order period on barracks P-81-11, as noted in finding 18, supra, plaintiffs poured part of the third floor slab. This work was not regarded by either plaintiffs or defendant as inconsistent with the stop order language “Req all work on third floor be stopped” because in the event that the third floor of that barracks should have been later deleted, the third floor slab could have been converted into a built-up roof by the addition of light-weight concrete to give it the proper slope. The evidence does not establish that the stop order had any ascertainable effect on the progress of the work on barracks P-81-11.
(c) None of the three proposals for changes could have interfered with the work on barracks P-81-10 until the work on this barracks had progressed beyond the third floor slab, in which event proposal (B), if adopted, would preclude any further structural work beyond the third floor slab, except the roof. As noted in finding 15 (c), supra, at the time of the issuance of the stop order this barracks had no construction above the first floor except certain columns; hence, during the stop order period there was considerable work which could have been done on this barracks without risk of possible subsequent deletion. Some of this work, as noted in finding 18, supra, was done during the stop order period. The evidence does not establish that the stop order had any ascertainable effect on the progress of the work on barracks P-81-10.
*386 (d) The only proposal which, if adopted, could have interfered with the work on barracks P-81-9 during the stop order period was proposal (C) which entailed the deletion of one of the barracks. Since at the time of the issuance of the stop order this barracks was the least complete of the four 252-enlisted men’s barracks, with only grade beams and footings poured, it would, of course, have been deleted if proposal (C) had been adopted. As noted in finding 18, supra, some productive work, including pile caps and footings, was accomplished on this barracks during the stop order period. The evidence does not establish specifically what work would probably have been accomplished which was not accomplished on this barracks but for the stop order.
21. On May 20, 1958, following a request by plaintiffs, defendant extended the contract date for completion for 50 calendar days, to and including July 30,1958, due to “delays caused by excessive inclement weather for the period from September 1957 through February 1958, beyond your control.”
22. The body of a letter dated June 30, 1958, addressed to defendant from plaintiffs reads as follows:
Work on the above mentioned project was restricted by your telegram of December 24-, 1957, requesting deductive cost estimates on proposed changes in the work.
These estimates were submitted to you on January 6, 1958, and rejected by your telephone call and letter of January 10, 1958 at which time the restrictions on the work were lifted.
We respectfully request the addition to our time of completion of eighteen days for the time the project was under curtailed work conditions and an additional twenty-one days which was necessary in which to notify our sub-contractors and suppliers and for them to reschedule production for the project.
23. A change order, dated July 16,1958, sent to plaintiffs from defendant, reads in part as follows:
Due to a stop order, and readjustment of the work schedule beyond your control, the contract time for completion is extended 39 calendar days to and including 17 September 1958. There is no change in the contract price.
*387 The stop order referred to in the above change order is the stop order of December 24, 1957.
24. Under date of November 13, 1959, plaintiffs sent to defendant’s contracting officer a letter and accompanying memorandum itemizing “a claim in the amount of $2,791.30 to cover the cost to us of work restrictions [on the contract project] from December 24, 1957 to January 10, 1958 as ordered by the Resident Officer in Charge of Construction.”
The claim was itemized as follows:
1 — Supervision and fixed labor-$1, 496. 52
2 — Rental costs_ 737.64
3 — Overhead _ 223.42
4 — Liability and compensation insurance- 89. 79
5 — Social security and unemployment taxes- 59.86
6 — Profit_ 156.43
7 — Bond premium_ 27. 64
Total_ 2,791.30
No amount was claimed on behalf of plaintiffs’ subcontractors, nor did the claim include any hourly based wages paid to laborers at the site of the project.[3]
25. A letter dated January 8, 1960, addressed to plaintiffs from defendant’s contracting officer reads as follows:
The Officer in Charge of Construction, Sixth Naval District has forwarded to the Bureau your letter of 13 November 1959 concerning your claim arising under contract NBy-5686 for Enlisted Men’s Barracks, Marine Corps Auxiliary Air Station, Beaufort, South Carolina. After a careful review of the facts presented, the Contracting Officer determines that your claim for increased costs due to delays represents a claim for damages and as such is not a proper subject of compensation under the contract.
Accordingly, for the foregoing reason, your claim in the amount of $2,791.30 as set forth in your letter of 13 November 1959 is'hereby denied.
This is the final decision of the Contracting Officer. If this decision decides a disputed question of fact or *388 is otherwise subject to the- procedure of the Disputes clause contained in this contract, you may, in accordance with the provisions of such Disputes clause, appeal from this decision to the Secretary of the Navy. The notice of appeal must be in writing and the original with two copies must be mailed or otherwise furnished to the Contracting Officer within thirty days from the date of receipt of this decision. Such notice should indicate that an appeal is intended and should reference this decision and identify this contract by number. The Armed Services Board of Contract Appeals is the authorized representative of the Secretary of the Navy for hearing, considering, and determining disputed questions of fact or other disputes which are made subject to the procedure of the Disputes clause by contract procedure. The Rules of the Armed Services Board of Contract Appeals are set forth in the Armed Services Procurement Regulation, Appendix A, Part 2.
Plaintiffs did not appeal from the decision contained in the above letter of January 8, I960.[4]
SUMMARY AND ULTIMATE FINDINGS
26. On December 24, 1957, while plaintiffs’ work crews were on Christmas vacation, defendant ordered plaintiffs to stop “all work on third floor barracks” and to submit deductive cost estimates on three plans of deletion. On January 6, 1958, plaintiffs submitted overall cost estimates to defendant. On January 10, 1958, defendant removed the stop order. The evidence does not establish that defendant was less than expeditious in processing plaintiffs’ cost estimates, reaching its decision to remove the stop order, and notifying plaintiffs of its decision.
27. The stop order was not intended by defendant nor interpreted by either defendant or plaintiffs as an order to stop all work under the contract. At the time the stop order was received by plaintiffs there was only one building out of the five buildings which plaintiffs were constructing which had structural work above the third floor; and irre- *389 speotive of which, if any, of the plans of deletion that might subsequently be adopted, plaintiffs and plaintiffs’ subcontractors had substantial productive work which could have been and was done on the various buildings in the interim until the stop order was removed. Plaintiffs’ work crews were on Christmas vacation at the time the stop order was received on December 24,1957, and until December 30, 1957. Thereafter, and until the stop order was removed on January 10,1958, they were engaged full-time on every working day in productive work on the contract project except when they could not work due to weather conditions, and except for the 1-day shift of about one-half of plaintiffs’ work crews to a different project, under another contract. Plaintiffs have not established and the evidence as a whole does not disclose, beyond mere speculation, the damages, if any, which plaintiffs suffered as a result of the stop order.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and the petition is dismissed.

 On September 12, 1961, plaintiffs amended their petition to include as part of tlie damages they seek to recover, the additional sum of $3,2-58.72, being the amount of wages paid by them for hourly labor for the period beginning December 24, 1957, and ending January 10, 195S. Plaintiffs’ total claim (as revised, amounting to $7,229.36) is based on plaintiffs’ contention that there was no productive work on the project for the period beginning December 24, 1957. and ending January 10, 1958.

 Defendant has asserted no affirmative defense based npon plaintiff’s failure to appeal from the contracting officer’s decision. In its Request for Findings defendant stated “* * * defendant affirmatively concurs in the characterization of the claim as one not encompassed within the price adjustment and disputes machinery of the contract and hence not one for which administrative remedies were available which required exhaustion before institution of this suit.”